# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Lance Phillip Wickner,

        Plaintiff,

v.

Mary McComb, Mike Green, William
Braun, Natalie Leseman, all sued in
their individual capacities,

        Defendants.

Civ. No. 09-1220 (DWF/JJK)

**REPORT AND
RECOMMENDATION**

---

Lance Phillip Wickner, 204147, MCF-OPH, 5329 Osgood Ave N., Stillwater, MN, 55802-1117, *pro se*.

Jackson Evans, Esq., Minnesota Attorney General's Office, counsel for Defendants.

---

JEFFREY J. KEYES, United States Magistrate Judge

## INTRODUCTION

This matter is before this Court on Defendants' Motion for Summary Judgment (Doc. No. 22), Plaintiff's Motion for the Appointment of Counsel (Doc. No. 30), and Plaintiff's Motion for Summary Judgment (Doc. No. 31). The case has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1. For the reasons stated below, this Court recommends that Defendants' motion be granted and Plaintiff's motions be denied.

**BACKGROUND**

**I.     The Parties and Plaintiff's Allegations, Generally**

Plaintiff is currently, and was during the times relevant to the issues addressed in this action, confined in the Oak Park Heights Correctional Facility. (Doc. No. 1, Second Am. Compl. ("SAC") ¶ 1.)  He is serving a sentence imposed after he pleaded guilty in July 1999 to a charge of second-degree criminal sexual conduct for an offense involving his ten-year-old niece.  (Doc. No. 26, Aff. of Ricardo Lopez ("Lopez Aff.") ¶ 3, Attach. 1, Exs. B & C.)  Defendants are various officials employed by the Minnesota Department of Corrections ("DOC"), who work at the Oak Park Heights facility.  (SAC ¶¶ 2-5.)

In this action, Plaintiff alleges that Defendants violated his First and Fourteenth Amendment rights by (1) confiscating a piece of mail containing the addresses and phone numbers of four women, two of whom were minors, that Plaintiff ordered from a company called U.S. Mint Green ("Mint"); and (2) confiscating a directory to the Minnesota Legislature, as well as materials containing addresses and phone numbers.  (SAC ¶¶ 9, 15-16, 30, 34.)  Plaintiff also claims that Defendants violated his procedural-due-process rights by denying him an opportunity to appeal the confiscation of the correspondence to the Correspondence Review Authority.  (*Id.* ¶ 31.)  Further, Plaintiff claims that Defendants retaliated against him in violation of his substantive-due-process and First Amendment rights by conducting a "suspicious cell search and confiscating non-contraband property" and by transferring him to a more restrictive housing

unit within the Oak Park Heights facility known as the Administrative Control Unit. (*Id.* ¶¶ 15, 17, 29, 32-33.)

## II.    Non-Delivery of Mail with Addresses

On February 19, 2009, Plaintiff wrote to Mint, requesting that the company send him the addresses of four women.  (Doc. No. 27, Aff. of Mary McComb ("McComb Aff.") ¶ 2, Attach. 1, Ex. A; Doc. No. 34, First Aff. of Lance Wickner ("First Pl.'s Aff.") ¶ 1, Attach. 1, Ex. 1.)  On March 11, 2009, Defendant Natalie Leseman, a DOC employee who was assigned to the Oak Park Heights mailroom at the time, inspected incoming mail from Mint to Plaintiff and discovered that the piece of mail contained the addresses of four women.  (Doc. No. 25, Aff. of Natalie Leseman ("Leseman Aff.") ¶ 3.)  Leseman discovered no stated reason why Mint was sending the addresses to Plaintiff, and because inmates' possession of the home addresses of private citizens can create security threats, she denied the mail and provided Plaintiff notice of the denial. (*Id.* ¶¶ 3-5, Attach. 1, Ex. B.)  Specifically, Leseman explained in the notice that she withheld the information from Mint because it "[c]onstitutes a risk to the safety and security of the facility, specific individuals or the general public."  (*Id.*) This justification for non-delivery corresponds to one of eleven reasons that mail is considered "unallowable" under DOC Directive 302.020, which governs the processing of incoming and outgoing mail at all DOC facilities.  (*Id.* ¶ 2, Attach. 1, Ex. B.)

After he received the notice of non-delivery of the mail from Mint, on March

11, 2009, Plaintiff complained to the mailroom supervisor, Defendant Mike Green, about Leseman's decision through a DOC Offender Kite Form.  (SAC, Attach. 1 at 12.)  In the Kite Form, Plaintiff explained his understanding that Mint had simply sent him several addresses and asked for an explanation of how such material could pose any security or safety risk.  (*Id.*)  Green responded on March 17, 2009, explaining that Plaintiff had a past record of contacting people he does not know and causing them concerns.  He informed Plaintiff that "[u]nless you can show you really are friends with these people, I support the decision of the Mail Room to deny this.  [F]eel free to appeal to Correspondence Review Board." (*Id.*; Doc. No. 24, Aff. of Mike Green ("Green Aff.") ¶ 2, Attach. 1, Ex. A.)  Plaintiff has never attempted to establish that he had a prior relationship with any of the women whose addresses he requested from Mint.  (Green Aff. ¶ 2.)

As mentioned in Green's response to Plaintiff's complaint about the non-delivery of the Mint letter, while Plaintiff has been confined at Oak Park Heights, he has, on a number of occasions, sent letters to women with whom he has no prior relationship.  (Lopez Aff. ¶¶ 5-6, Attach. 1, Exs. G-N; Doc. No. 38, Second Aff. of Lance Wickner ("Second Pl.'s Aff.") ¶ 2 (admitting that Plaintiff has sent unsolicited letters to women he does not know).)  Plaintiff asserts that in such letters he introduces himself, explains why he is in prison, and asks the addressee whether she would like to correspond with him.  (Second Pl.'s Aff. ¶ 4.)  Several women Plaintiff has contacted in this manner have requested that Plaintiff be prevented from making any further contact with them.  (Lopez Aff.

¶¶ 5-6, Attach. 1, Exs. G-L; Second Pl.'s Aff. ¶ 5.)  Each time the DOC has received such requests, it has given Plaintiff direct orders to cease contacting the individual making the request.  (Lopez Aff. ¶¶ 5-6; Second Pl.'s Aff. ¶ 5.)  Plaintiff has complied with these direct orders and ceased contacting any specified individual whom he has been specifically ordered not to contact.  (Second Pl.'s Aff. ¶ 5.)  There is no evidence that Plaintiff's unsolicited letters to women with whom he has no prior relationship were obscene or directly threatening, but in at least one instance, an individual who intercepted a letter from Plaintiff to her elderly, vulnerable mother indicated that she was concerned because of the "personal feelings expressed in the letter and the nature of the poem, which was enclosed."  (Lopez Aff. ¶ 6, Attach. 1, Ex. K.)

Despite this pattern, Plaintiff has continued to try and contact women with whom he has no prior relationship.  (*Id.*, Ex. M.)  As a result, on January 9, 2003, Oak Park Heights staff issued a direct order requiring Plaintiff "to cease communicating with private citizens that [he] w[as] not acquainted with."  (*See id.*, Ex. N.)

## III.   Plaintiff's Appeal of Non-Delivery of Mail and Defendants' Alleged Retaliation

On March 17, 2009, Plaintiff appealed Defendant Green's decision upholding the non-delivery of the Mint letter to the Correspondence Review Authority, explaining that it was his view that Green's decision to withhold the addresses was unjustified as follows: "If the people don't want me to contact

them, they can call the facility, at which time the facility can give me a direct order not to contact them."  (SAC, Attach. 1 at 13.)  Plaintiff also asserted that he felt Green was merely tampering with his mail in retaliation for a different lawsuit that Plaintiff filed against Green.  (*Id.*)  Defendant Mary McComb, an Associate Warden at Oak Park Heights, began working on Plaintiff's appeal on April 14, 2009, and she discovered that the women whose addresses Plaintiff sought were featured in the February 2009 edition of a publication called "Session Weekly," one of a few publications that inmates in disciplinary segregation, such as Plaintiff, are ordinarily allowed to receive.  (McComb Aff. ¶ 4, Attach. 1, Ex. C.)  Associate Warden McComb completed an Incident Report, concluding that because Plaintiff had previously been disciplined for making contact with women he had seen in publications, Oak Park Heights would no longer be delivering Session Weekly to him and would be removing any issues currently in his possession from his cell.  (*Id.*)  Associate Warden McComb further stated her view that Plaintiff had abused the privilege of receiving the Session Weekly publication.  (*Id.*)

On April 15, 2009, Defendants Green and Sergeant William Braun conducted a "suspicious shakedown" of Plaintiff's cell following Associate Warden McComb's April 14, 2009 Incident Report.  (McComb Aff. ¶ 5, Ex. D.)  Green and Sergeant Braun confiscated several Session Weekly magazines, a Yellow Pages phone book, and several photos of women that appeared to be cut-outs from books and other legal correspondence he had been receiving, as

well as other photos of women that were apparently torn from paperback books. (*Id.*) They also confiscated several pornographic drawings, a "face sheet of an offender at MCF-Shakopee [the Minnesota Correctional Facility in Shakopee], many homemade address books (looks like [Plaintiff] copied these names from law journals and phone books) and paperwork belonging to another offender." (*Id.*; Doc. No. 33, Pl.'s Statement of Undisputed Facts ("Pl.'s Statement") ¶ 12.) Green and Sergeant Braun confiscated all these photos and drawings as contraband. (McComb Aff. ¶ 5, Ex. D.) They found the photos hidden in homemade smuggling devices created from address books and legal material. (*Id.*; Pl.'s Statement ¶ 11 (admitting that Green and Sergeant Braun found smuggling devices made of legal papers that were used to conceal photographs of women); Pl.'s Second Aff. ¶ 12 (same).) After the search, Green and Sergeant Braun completed and provided Plaintiff with a property-removal receipt. (McComb Aff. ¶ 5, Ex. D; Second Am. Compl., Attach. 1 at 16.)

On April 17, 2009, Plaintiff was charged with three violations of DOC's offender Discipline Regulations, for destruction, damage, or alteration of property, possession of contraband, and possession of a smuggling device. (McComb Aff. ¶ 5, Attach. 1, Ex. D.) Following the notice of disciplinary violations, DOC scheduled a hearing for April 28, 2009, and indicated that the discipline report could be settled by waiver until the day before the hearing. (*Id.* ¶ 9, Attach. 1, Ex. H.) On April 25, 2009, Plaintiff signed a waiver of hearing and entered a plea of guilty, accepting a minor penalty for violating the rule prohibiting

possession of contraband.  (*Id.* ¶ 10, Attach. 1, Ex. I.)  On April 28, 2009, Plaintiff

submitted a handwritten brief as a defense to the rules violations explaining that

he felt the search of his cell was unconstitutional retaliation for writing a letter to a

woman he did not know.  (*Id.* ¶ 11, Attach. 1, Ex. J.)  He further indicated that he

would admit to rules violations "in part only" because he felt that certain items

taken from his cell (such as non-pornographic drawings, a calendar, a directory

to the Minnesota Legislature, and other items with contact information) did not

qualify as contraband.  (*Id.* at 4; Pl.'s Statement ¶ 13.)

On April 30, 2009, Associate Warden McComb transferred Plaintiff to a

more restrictive housing area within the Oak Park Heights facility known as the

Administrative Control Unit ("ACU").  (Pl.'s Statement ¶ 17; Lopez Aff. ¶ 7,

Attach. 1, Ex. O at 2.)  Defendant Lcie Stevenson, the overseer of the

segregation units at the Oak Park Heights facility, asserts that she was

responsible for the transfer, and the transfer occurred because Plaintiff had a

lengthy segregated sentence as a result of multiple disciplinary violations.  (Doc.

No. 28, Aff. of Lcie Stevenson ("Stevenson Aff.") ¶¶ 5, 7.)  Plaintiff asserts that

Stevenson's proffered reason is contrived to explain the retaliation for his

grievances regarding the seizure of his property around this same time period.

(Second Pl.'s Aff. ¶ 13.)  It is undisputed that Plaintiff has a long disciplinary

history during his confinement at the Oak Park Heights facility.  (First Pl.'s Aff.,

Attach. 1, Exs. 15-16.)

On May 1, 2009, Plaintiff sent an Offender Kite Form to Green asserting

that prison officials deprived him of his right to a hearing to challenge the search of his cell and confiscation of his property.  (Green Aff. ¶ 5, Ex. D.)  On May 5, 2009, Green agreed to give a calendar back to Plaintiff that Green and Sergeant Braun seized in the search of Plaintiff's cell.  (*Id.*)  However, Green indicated that he would not be returning any of the other materials taken because of security concerns, and he informed Plaintiff that he could appeal that decision to Associate Warden McComb.  (*Id.*)

On May 6, 2009, Plaintiff sent an Offender Kite Form to Associate Warden McComb, asserting that he had been retaliated against for appealing the decision to withhold the addresses he had ordered from Mint.  (McComb Aff. ¶ 13, Ex. L.)  In the Kite Form, Plaintiff alleged that rather than rendering a decision on Plaintiff's appeal of the non-delivery of the addresses from Mint, Associate Warden McComb decided to have Plaintiff's cell searched to take all of his legal publications, "attorney profiles," directory to the Minnesota Legislature, and addresses.  (*Id.*)  He further complained that Associate Warden McComb placed Plaintiff in the ACU because he continued to appeal the non-delivery of the letter from Mint.  (*Id.*)  Associate Warden McComb responded the following day as follows:

> None of these actions were retaliatory.  They were based on security and protecting the public.  You were searching for the addresses of young women featured in the Session Weekly and have a history of unwanted correspondence with women you don't know.  We must prevent you from engaging in these activities.

(*Id.*)  Associate Warden McComb had also previously informed Plaintiff that he

would not be receiving a separate appeal from his challenge regarding the issue of the non-delivery of addresses from Mint because his complaint had led to incident reports, a room search, and because discipline was pending.  (SAC, Attach. 1 at 17.)

## DISCUSSION

### I.    Standard of Review

Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court must view the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or

denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.     Analysis

### A.     Plaintiff's First Amendment Claim Regarding Mail from Mint

As noted above, in his Second Amended Complaint, Plaintiff claims that Defendants' decision to withhold the letter from Mint that included the addresses of four unknown women, two of whom are minors, violated his First Amendment rights.  Both parties move for summary judgment on this claim.

When an inmate raises a facial challenge to a regulation, courts have acknowledged that prisoners retain certain constitutional rights, but also give deference to the determinations made by prison officials in the administration of their facilities.  "'[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'"  *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)).  However, "[i]t is settled law that convicted persons 'do not forfeit all constitutional protections by reason of their conviction and confinement in prison.'"  *Thongvanh v. Thalacker*, 17 F.3d 256, 258 (8th Cir. 1994) (quoting *Bell v. Wolfish*, 441 U.S. 520 (1979)).  "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests[,]" so that prison officials, rather than courts, determine the appropriate course of prison

administration.  *Turner v. Safley*, 482 U.S. 78, 89 (1987).  Thus, "'[i]n the First

Amendment context . . . a prison inmate retains those First Amendment rights

that are not inconsistent with his status as a prisoner or with the legitimate

penological objectives of the corrections system.'"  *Leonard v. Nix*, 55 F.3d 370,

374 (8th Cir. 1995) (quoting *Pell*, 417 U.S. at 822).

"Regulations involving the review of incoming mail in prisons need only be

'reasonably related to legitimate penological interests.'"  *Murphy v. Mo. Dep't of

Corrs.*, 372 F.3d 979, 985-86 (8th Cir. 2004) (quoting *Thornburgh v. Abbott*, 490

U.S. 401, 413-14 (1989), and applying the *Turner* factors to an inmate's First

Amendment challenge under the Free Speech Clause to prison officials' refusal

to deliver a publication he received in the mail).  To determine whether the

regulation at issue here has a reasonable relationship to a legitimate penological

objective, this Court considers four factors: (1) whether there is a valid, rational

connection between the regulation and the legitimate interest asserted to justify

it; (2) whether there are alternative means of exercising the right that remain

available to inmates; (3) the extent to which accommodating the asserted right

will impact guards and other inmates, as well as allocation of prison resources;

and (4) whether there are ready alternatives to the regulation at issue.  *See*

*Turner*, 482 U.S. at 89-91; *Thongvanh*, 17 F.3d at 259.  Prison officials do not

have to meet all four or even a majority of the *Turner* factors to defend a prison

policy because they are simply factors to consider in determining whether the

regulation is reasonably related to legitimate penological interests.  *Beard v.*

*Banks*, 548 U.S. 521, 533 (2006). Thus, to the extent Plaintiff raises a facial challenge to the regulation governing incoming mail, this Court must consider these factors to determine if the policy is unconstitutional.

Several courts of appeals have held that "[t]he *Turner* analysis applies equally to facial and 'as applied' challenges." *Bahrampour v. Lampert*, 356 F.3d 969, 975 (9th Cir. 2004); *Flagner v. Wilkinson*, 241 F.3d 475, 484 n.5 (6th Cir. 2001) ("Under *Turner*, [a] plaintiff[] may pursue as-applied challenges to facially valid prison regulations."); *United States v. Reid*, 369 F.3d 619, 626 (1st Cir. 2004) (citing *Thornburgh* and *Turner* in discussing an "as-applied challenge" under the First Amendment); *see also Lindell v. Huilbregtse*, 205 F. App'x 446, 448-49 (7th Cir. 2006) (noting, in the context of an "as-applied" free-speech claim, that under the First Amendment, prison officials may restrict correspondence between inmates and citing *Turner*). At the summary-judgment stage, the issue with such as-applied challenges is whether there is a genuine dispute regarding the legitimacy of prison officials' reasons to apply the governing regulation in the particular circumstances of the prisoner's case. *See Hargis v. Foster*, 282 F.3d 1154, 1158 (9th Cir.) (considering whether a jury could reasonably conclude that prison officials acted unreasonably in applying a policy prohibiting certain coercive communications with prison officials to an inmate's statements allegedly intended to coerce an officer into not enforcing a prison rule), *amended and superseded by*, 312 F.3d 404 (9th Cir. 2002). Thus, to the extent Plaintiff raises an as-applied challenge to Defendants' decision to withhold

the addresses that Mint sent to him, the question is whether a jury could reasonably conclude that Defendants had any legitimate reason to refuse to forward the information in the Mint letter to Plaintiff.

### 1. Facial challenge

The regulation at issue here is the Minnesota DOC's Policy 302.020, which, in relevant part, indicates that incoming mail is not authorized if it "constitutes a risk to the safety and security of the facility, specific individuals or the general public." (Leseman Aff. ¶ 2, Attach. 1, Ex. A at 4.) It is well settled that an interest in protecting the safety and security of a correctional institution and protecting the safety and security of specific individuals or the general public is a legitimate penological interest. *See Pell*, 417 U.S. at 823 (discussing the legitimate interests of correctional facilities, including deterring crime, quarantining criminal offenders for protective and rehabilitative purposes, and internal security). Additionally, corrections facilities have a "legitimate interest in protecting the public from harassment." *Berdella v. Delo*, 972 F.2d 204, 209 (8th Cir. 1992). In this Court's view, under the first *Turner* factor, DOC Policy 302.020 bears a rational relationship to these legitimate interests because the DOC's decision to consider certain mail "unallowable" can prevent inmates from obtaining contraband that presents security risks within the facility, or information about potential witnesses and other individuals that threatens the security or safety of the general public or specific individuals. Although this is by no means an exhaustive list of the ways in which the unallowable-mail regulation serves

such legitimate penological interests, these reasons suffice to establish that the regulation is neither arbitrary nor irrational.  *See Turner*, 482 U.S. at 89-90 (explaining that a regulation bears a rational relationship unless the logical connection between the regulation and its asserted goal is arbitrary or irrational).

The regulation also does not foreclose all avenues of an inmate's First Amendment right to receive correspondence.  The regulation does not interfere with an inmate's right to obtain religious, political, artistic, or other information that amply preserves the prisoner's "'right to receive, the right to read and freedom of inquiry, [and] freedom of thought . . . .'"  *Beard*, 548 U.S. at 544 (Stevens, J., dissenting) (quoting *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965)).  And Plaintiff does not argue that the regulation's curtailment of unfettered access to incoming mail, on its face, denies these aspects of his First Amendment rights in an unreasonable manner.

As to the remaining *Turner* factors, eliminating the policy on unallowable mail, and thereby "accommodating the asserted right," *Turner*, 482 U.S. at 90, would unquestionably have a negative impact on guards and other inmates.  Doing away with the policy would make it possible for prisoners to receive contraband such as weapons without oversight from prison officials.  The resulting costs of prison administration would include, but not be limited to, requiring increased security to prevent violent attacks among inmates.  Removing the policy would also make it possible for prisoners to find witnesses' addresses and increase the chances that inmates could intimidate or harass

them.  Plaintiff has offered no alternative to the regulation that accommodates his rights at a minimal cost to the valid penological interests at play, and this Court will not speculate on what alternatives might exist because to do so would be to second-guess the expert judgment of prison officials.

Based on the foregoing, this Court concludes that there is no genuine issue of material fact as to whether the regulation at issue here has a reasonable relationship to a legitimate penological objective.  It does, and therefore the regulation is facially valid.  Therefore, this Court concludes that Defendants are entitled to judgment as a matter of law on Plaintiff's First Amendment claim to the extent he asserts a facial challenge to the unallowable-mail provision in DOC Policy 302.020.

### 2. As-applied challenge

This Court also determines that no reasonable jury could conclude that Defendants unreasonably applied the unallowable-mail provision in DOC Policy 302.020 when they denied Plaintiff the Mint letter.  Plaintiff has a history of contacting women with whom he has no prior relationship, and on each occasion he has done so, the women to whom he has written have requested that he cease communicating with them.  The evidence suggests that Plaintiff found the four women whose addresses he attempted to obtain from Mint in a February 2009 edition of the Session Weekly publication.  (*See* McComb Aff. ¶ 4.)  Plaintiff has no relationship with these women.

Taking this evidence in the light most favorable to Plaintiff for the purposes

of Defendants summary-judgment motion, this Court can infer that Plaintiff attempted to obtain these addresses to begin some correspondence with women he did not know as he has attempted to do in the past.  Given that Plaintiff has presented no evidence that these individuals wish to communicate with him and his lengthy history of contacting women who want nothing to do with him, only an unreasonable jury could conclude that the Defendants acted unreasonably in determining that Plaintiff's access to the addresses he ordered posed potential security or safety risks to these four women.

Further, Mint has been added to the DOC's list of "banned vendors" from whom all incoming mail is rejected.  This occurred because inmates have been known to use it in the past to find the addresses of private citizens, and because Mint advertises in inmate magazines offering to help find the addresses of witnesses.  (*See* Leseman Aff. ¶ 6.)  Preventing all incoming mail from such a source furthers the legitimate penological interest of protecting specific individuals and the public in general from harassment.  And, to accommodate Plaintiff's desire to communicate with these particular women through writing letters, Defendants provided Plaintiff with an opportunity to explain whether he knows the women whose addresses he requested, which he never did.  A reasonable jury could not conclude that Defendants, acting in conformity with the general ban on incoming mail from Mint, and accommodating his opportunity to engage in correspondence with private citizens he knows, violated Plaintiff's constitutional rights by denying him access to the addresses of the four unknown

women in the Mint letter.

There is also no dispute that Plaintiff is permitted to join a prison pen-pal club through which he could communicate with women he does not already know. (McComb Aff. ¶ 16.) Therefore, Defendants provide Plaintiff with reasonable alternative means for engaging in communication with women previously unknown to him. No reasonable jury could conclude that Defendants acted unreasonably in denying him the addresses of women he did not know because the undisputed evidence shows that he has access to an adequate alternative to engage in the same general category of correspondence.

All of these circumstances show that Defendants acted reasonably when they determined that allowing Plaintiff to obtain these addresses could present a risk to the security or safety of the women involved, two of whom are minors. Accordingly, this Court determines that there is no genuine issue of material fact for trial on this issue and concludes that Defendants are entitled to summary judgment on Plaintiff's First Amendment claim to the extent he asserts an as-applied challenge to the unallowable-mail provision in DOC Policy 302.020. Therefore, this Court recommends that Defendants' motion be granted and Plaintiff's motion be denied with respect to this claim.

## B. Plaintiff's First Amendment Claim Regarding the Seizure of Materials from his Cell

Plaintiff also claims that Defendants' seizure of certain items from his cell that he claims are non-contraband violated his First and Fourteenth Amendment

rights.  (SAC ¶¶ 34-35.)

### 1.    First Amendment correspondence claim

With respect to his First Amendment claim, Plaintiff argues that Defendants McComb, Green, and Braun violated his "right to correspond by confiscating all [of his] addresses, phonebooks and Directories in the cell search on April 15, 2009."  (Pl.'s Opp'n 11; Pl.'s Mem. 10.)  He claims that it is undisputed that these Defendants confiscated all of his addresses and the Minnesota Legislative Directory, which deprived him of his ability to write grievances to the Minnesota Representatives.  (Pl.'s Mem. 10.)  DOC Policy 301.083 governs the limitations placed on prisoner possessions in segregation units within the Oak Park Heights facility.  As is relevant here, the regulation allows inmates in segregation to have "legal materials" and one "address book." (McComb. Aff. ¶ 17, Attach. 1, Ex. M at 5.)  Plaintiff presents no argument that this regulation is facially unconstitutional.  Most favorably construed then, Plaintiff's claim is that Defendants' violated his First Amendment right to correspond when they applied DOC Policy 301.083 to seize materials within his cell that contain contact information for members of the general public, his family, his friends, and public officials with whom he wishes to correspond.

Defendants have presented evidence that Plaintiff used directories, homemade address books, and miscellaneous pieces of paper within his cell to make smuggling devices in which he concealed contraband.  (Green Aff. ¶ 4.) He turned these items into smuggling devices by gluing two sheets of paper

together, but leaving one side un-glued, so that the pieces of paper would appear to be one sheet while, in fact, forming a pocket in which Plaintiff could secret contraband. (*Id.*) Plaintiff disputes these facts, testifying in his affidavit that he had not altered into smuggling devices all of the materials seized from his cell. (First Pl. Aff. ¶ 13.) Candidly, he states that he only makes smuggling devices out of legal papers with at least thirty pages or more stapled together so that he can hide contraband in these thicker stacks from officers who would otherwise be able to feel the contraband through the paper. (*Id.*) He asserts that "[a]ll of my papers with addresses and directories, drawings and session weekly publications were not altered into smuggling devices." (*Id.*)

The parties' dispute about whether Plaintiff created smuggling devices from materials that Defendants seized from Plaintiff's cell is irrelevant if the First Amendment does not protect an inmate's right to possess contact information in his cell. Plaintiff has presented no evidence that he was prevented from initiating any legal proceeding. Therefore, the evidence in the record does not implicate his right of access to the courts. *See Nelson v. Horel*, No. C 07-4094 CRB (PR), 2008 WL 152219, at *1 (N.D. Cal. Jan. 9, 2008) (concluding that a prisoner's claim that the confiscation of his address book violated his constitutional right to access the courts failed to state a § 1983 claim because the prison officials' actions did not prevent him from initiating a legal proceeding). And, with respect to Plaintiff's "right to correspond," his claim and the evidence in the record do not suggest that Defendants have exacted a total ban on sending and receiving mail.

*See Preston v. Cowan*, 369 F. Supp. 14, 23 (W.D. Ky. 1973) (discussing caselaw indicating that "a total ban is in violation of First Amendment rights still retained by prisoners"), *aff'd in part and vacated in part on other grounds*, 506 F.2d 288 (6th Cir. 1974).  Nor does the evidence even begin to suggest that Defendants have prevented him from engaging in confidential communications with his attorney.  *See Al-Amin v. Smith*, 511 F.3d 1317, 1333-34 (11th Cir. 2008) (concluding that an inmate's "use of the mail to communicate confidentially with attorneys about his cases is not inconsistent with his prisoner status or with legitimate penological objectives").

Some curtailment of an inmate's right to correspond with whomever he chooses is clearly constitutional.  *See, e.g.*, *Turner*, 482 U.S. at 93 (upholding as a reasonable restriction on inmates' First Amendment rights a prison policy banning inmate-to-inmate correspondence).  Here, Plaintiff has done no "more than point to the existence of a generic First Amendment right" and has not presented evidence "that he exercised that right in a *manner* consistent with his status as a prisoner."  *See Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 864 (5th Cir. 2004).

Further, Plaintiff did not present evidence that would allow a reasonable jury to conclude that Defendants' application of the regulation at issue failed to otherwise reasonably accommodate his right to correspond.  For example, Plaintiff has presented no evidence that he is prohibited from reviewing the addresses of members of the Minnesota Legislature through requests to the

prison library, and Defendants have presented undisputed evidence that Plaintiff may still receive letters from anyone, and write letters to friends, family, clergy, or other individuals with whom he has some connection. (*See* McComb Aff. ¶¶ 15.) While not having the contact information readily available in his cell may make Plaintiff's efforts at correspondence less convenient, based on the record before this Court, no reasonable jury could conclude that Defendants unreasonably applied the regulation controlling inmates' in-cell possessions.

Moreover, even if Plaintiff had presented evidence that would allow his case to be submitted to a jury on this claim, Defendants Green, Braun, and McComb (the only individuals implicated by this claim) would be entitled to qualified immunity. The qualified-immunity inquiry involves "two questions: '(1) whether the facts alleged or shown, construed in the light most favorable to [the plaintiffs], establish a violation of a constitutional . . . right, and (2) whether the constitutional right was clearly established as of [the time of the relevant conduct], such that a reasonable official would have known that his actions were unlawful.'" *Langford v. Norris*, __ F.3d __, 2010 WL 2813551, at *9 (8th Cir. July 20, 2010) (alterations and elisions in original) (quoting *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009)). The parties have presented, and this Court has uncovered, no case that so clearly establishes that the boundaries of a prisoner's "right to correspond" extend to the unconditional possession of contact information in his cell such that Defendants would have known that removing the allegedly non-contraband items from Plaintiff's cell was unlawful.

22

For all these reasons, this Court recommends granting Defendants' motion for summary judgment on this claim and denying Plaintiff's cross-motion.

## 2. Due-process claim

Plaintiff also argues that the seizure of certain materials, such as attorney profiles and the directory to the Minnesota Legislature violated his due-process rights. However, even the seizure of a prisoner's legal papers by prison officials does not violate due process unless the seizure caused prejudice to the prisoner in a legal proceeding. *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006). Plaintiff argues that he was using the directory to write grievances to Minnesota Representatives about prison and civil-rights issues. Plaintiff, however, did not plead any facts or present any evidence to suggest that he was prejudiced in a particular legal proceeding. Accordingly, Defendants are entitled to summary judgment with respect to Plaintiff's due-process claim stemming from the seizure of contact information from Plaintiff's cell.

## C. The General-Correspondence Order

Plaintiff directs the majority of his argument in support of his own motion for summary judgment and in opposition to Defendants' motion for summary judgment to the topic of an order that prohibits Plaintiff from drafting correspondence to private citizens with whom he has had no prior contact. (*See* Doc. No. 32, Pl.'s Mem. of Law in Supp. of the Mot. for Summ. J. ("Pl.'s Mem.") 3-6; Doc. No. 36, Pl.'s Mem. of Law in Opp'n of Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") 1-8.) Presumably, Plaintiff is referring to the order, as described above,

*see* discussion, *infra*, at p. 4-5, wherein the Oak Park Heights facility gave Plaintiff a "direct order to cease any form of communications with All Private Citizens which [he] had no previous associations." (Lopez Aff. ¶ 6, Attach. 1, Ex. N.)

Although the breadth of this general-correspondence order may significantly interfere with a wide range of correspondence Plaintiff wishes to engage in, this Court will not address its legality in this case. Plaintiff's Second Amended Complaint, even when liberally construed, does not assert a claim that Defendants violated Plaintiff's constitutional rights by issuing the order. Plaintiff's First Amendment claim only concerns Defendants' decision to deny him the addresses he ordered from Mint and the confiscation of certain materials from his cell during a search. The Second Amended Complaint does not mention the general order that Plaintiff cease contacting members of the public. Plaintiff did not attach the order to his Second Amended Complaint. And Plaintiff nowhere alleges that he attempted to send a letter that, through operation of the general-correspondence order, Defendants refused to place in the outgoing mail. It is well settled that a party cannot raise new, previously unpleaded claims in opposition to summary judgment or obtain summary judgment on a claim that is not asserted anywhere in the pleadings. *Rodgers v. City of Des Moines*, 435 F.3d 904, 910 (8th Cir. 2006) (noting that the district court properly refused to consider unpleaded allegations advanced in opposition to a summary-judgment motion); *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1314, 1315 (11th

Cir. 2004) (noting that "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment" and that "a liberal pleading standard for civil complaints . . . does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage").

Moreover, although there is one piece of documentary evidence in the record submitted by Defendants that alludes to the general-correspondence order's contents (Lopez Aff. ¶ 6, Attach. 1, Ex. N), the order itself does not appear anywhere in the record. To pass upon the constitutionality of this order, the terms of which this Court has never seen, would require this Court to exercise not judgment, but speculation. For all these reasons, this Court will not consider these unpleaded allegations here and offers no opinion on the general-correspondence order's legality.

### D. Denial of an Appeal – Procedural Due Process

The parties both move for summary judgment on Plaintiff's claim that Defendants violated Plaintiff's rights to procedural due process by refusing to issue a written decision on his appeal to the Correspondence Review Authority's decision to withhold the mail sent to him by Mint. Defendants argue that this claim fails because Plaintiff had no liberty interest in receiving the letter from Mint, and, even if he did, he was provided adequate procedures to satisfy the Fourteenth Amendment. (Defs.' Mem. 25-26, 31-32.) Plaintiff argues, however, that he was entitled to have an appeal decision from the Correspondence Review Authority regarding the Mint letter, but Defendant McComb denied him that

procedure when she wrote an incident report explaining that no written decision on Plaintiff's appeal would follow.  (SAC ¶ 31; *see* Pl.'s Opp'n 10.)

The Due Process Clause guarantees that certain interests will not be deprived without giving the individual an opportunity to be heard.  To claim the protections of this aspect of the Due Process Clause, a prisoner must first enumerate a recognized liberty interest.  *See Snodgrass v. Robinson*, 512 F.3d 999, 1003 (8th Cir. 2008).  A recognized liberty interest may arise from the United States Constitution or from a state law.  *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974).  A prisoner has a liberty interest in freedom from restraints that "impose[] atypical and significant hardship[s] on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

Plaintiff contends that he was denied procedural due process because DOC officials failed to follow their own policies on processing inmate grievances. Specifically, he argues that the DOC's regulations use mandatory language that requires DOC officials to provide a written decision anytime there is an appeal to the Correspondence Review Authority regarding the denial of prisoner mail. (*See* Pl.'s Mem. 6-7; Pl.'s Opp'n 8-9.)  DOC Policy 302.020 provides that the Correspondence Review Authority "will provide a written decision and rationale within ten days of receipt of the offender's request[.]"  (Leseman Aff. ¶ 2, Attach. 1, Ex. A at 5.)  However, Plaintiff's claim fails as a matter of law because "a violation of prison regulations in itself does not give rise to a constitutional violation."  *Bonner v. Fed. Bureau of Prisons*, 196 F. App'x 447, 448 (8th Cir.

2006); *see also Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003) ("[T]here is no federal constitutional liberty interest in having state officers follow state law or prison officials follow prison regulations."). Thus, to the extent that Plaintiff is arguing that Defendants violated the procedures prescribed by the prison's own rules, Plaintiff's constitutional claim fails.

To the extent Plaintiff alleges that the response to his appeal to the Correspondence Review Authority failed to provide procedures required by the Constitution, his claim fails as well. "The decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards." *See Procunier v. Martinez*, 416 U.S. 396, 417 (1974), *overruled on other grounds by*, *Thornburgh*, 490 U.S. 401. Such minimum procedural safeguards require that an inmate be notified of the rejection of the mail, have a reasonable opportunity to protest the decision, and be given an opportunity to appeal the decision to a prison official who was not involved in the original censorship decision. *Id.* Here, however, no reasonable jury can conclude that Plaintiff was denied notice of the decision that the Mint letter would not be delivered, an opportunity to protest that decision, and an opportunity to appeal the denial to someone other than the official who made the original censorship decision. The undisputed record shows that Leseman gave Plaintiff notice of the non-delivery. Plaintiff then protested that decision to the mailroom supervisor, Mike Green. After being unsatisfied with Green's decision to uphold the non-delivery, Plaintiff filed an appeal to the Correspondence Review Authority. The record therefore

reflects that there is no genuine issue of material fact as to the due-process safeguards required by *Procunier*. Plaintiff specifically argues that Defendant McComb violated his right to an opportunity to appeal when she did not provide a written decision on his appeal as required by the prison's rules. As noted above, however, the failure to follow prison regulations does not, by itself, deny a prisoner due process. And further, to the extent that Plaintiff argues that the "opportunity to appeal" required by *Procunier* minimally requires that some decision be made related to a prisoner's protest of the non-delivery of certain incoming mail, this Court concludes that Associate Warden McComb's decision to explain why the prison was withholding the Mint letter through an incident report is sufficient to address such concerns. Because Defendants satisfied the *Procunier* safeguards in this case, Defendants are entitled to judgment as a matter of law.

### E.    Cell Search – Retaliatory Discipline and Substantive Due Process

The parties both move for summary judgment on Plaintiff's claim that Defendants violated his First Amendment rights and his substantive-due-process rights by searching his cell in retaliation for his complaint about the denial of the letter from Mint.

### 1.    Retaliatory discipline

Plaintiff asserts that he is entitled to summary judgment on his retaliation-based claim because (1) it is undisputed that Associate Warden McComb wrote

an incident report in response to Plaintiff's appeal of the non-delivery of the Mint letter, and (2) it is undisputed that Defendants Green and Sergeant Braun searched his cell in response to the incident report.

To the extent Plaintiff invokes the First Amendment, this court construes his claim as one alleging that Defendants engaged in retaliatory discipline for Plaintiff's exercise of a First Amendment right. A retaliatory-discipline claim requires a showing that "(1) the prisoner exercised a constitutionally protected right; (2) prison officials disciplined the prisoner; and (3) exercise of the right was the motivation for the discipline." *Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1119 (8th Cir. 2007). "The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity." *Haynes v. Stephenson*, 588 F.3d 1152, 1155-56 (8th Cir. 2009) (quotations omitted). To show that "exercising the protected right motivated the discipline, an inmate must show that but for a retaliatory motive the prison official would not have" taken the disciplinary action. *Id.* at 1156. However, merely alleging that an act was retaliatory is insufficient. *See Benson v. Cady*, 761 F.2d 335, 342 (7th Cir. 1985).

Plaintiff appealed the mailroom's non-delivery of the Mint letter on March 17, 2009. On April 14, 2009, Associate Warden McComb began working on Plaintiff's appeal. McComb explained, in an incident report, that her investigation suggested that Plaintiff was attempting to make contact with women whose pictures he had found in a publication, which Plaintiff's discipline supervisor explained had presented disciplinary problems in the past. McComb's

investigation apparently led her to suspect that Plaintiff was keeping items in his cell that he was not supposed to have under prison rules. The following day, Defendants Green and Sergeant Braun searched Plaintiff's cell and seized several items, including several Sessions Weekly publications from which McComb concluded Plaintiff found pictures of the women whose addresses he requested from Mint.

Defendants do not dispute that Plaintiff's filing of a grievance over the non-delivery of the letter from Mint was an act protected by the First Amendment. However, even assuming that the decision to conduct a one-time search of Plaintiff's cell could be considered "discipline," other than his bare assertion, Plaintiff has made no showing that Defendants McComb, Green, and Braun were motivated by a desire to retaliate against him for filing a grievance. This Court disagrees with Plaintiff's argument that Associate Warden McComb's drafting of an incident report after beginning work on Plaintiff's appeal was motivated by Plaintiff's exercise of his First Amendment rights. Even though Associate Warden McComb referred to the appeal in her incident report, there is no evidence that her decision to write an incident report was motivated by a desire to get back at Plaintiff for appealing the denial of the letter from Mint. It would be unreasonable to infer that her reference to the appeal in the incident report was anything other than context for the origins of her suspicion that Plaintiff possessed items in his cell that he should not have had. The only evidence in the record suggests that McComb drafted the incident report because her

investigation of Plaintiff's request for the addresses uncovered that he "ha[d] been previously disciplined for attempts to make unwelcome contact with young women he ha[d] seen in publications." (McComb Aff. ¶ 4, Attach. 1, Ex. C.) Based on the foregoing, this Court concludes that there is no evidence from which a reasonable jury could conclude that the search of Plaintiff's cell and subsequent confiscation of his property was motivated by the grievance, and Defendants are entitled to summary judgment on this claim.

### 2. Substantive due process

Plaintiff also claims that Defendants' search of his and confiscation of his property violated his substantive-due-process rights, and the parties both seek summary judgment of this claim as well. Defendants argue that Plaintiff's substantive-due-process claim cannot survive summary judgment because, as a matter of law, Plaintiff has no fundamental right to be free from searches of his cell. (*Id.* at 29-30.) Plaintiff argues that "defendants McComb, Green and Braun . . . violated the due process clause of the fourteenth amendment by conducting the search in retaliation and depriving plaintiff of property." (Pl.'s Mem. 9; Pl.'s Opp'n 11.)

"To establish a violation of substantive due process rights by an executive official, a plaintiff must show (1) that the official violated one or more fundamental constitutional rights, and (2) that the conduct of the executive official was shocking to the contemporary conscience." *Flowers v. City of Minneapolis, Minn.*, 478 F.3d 869, 873 (8th Cir. 2007) (quotations omitted). The fundamental

rights protected by the substantive component of the Due Process Clause are those "'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Id.* (quoting *Terrell v. Larson*, 396 F.3d 975, 978 n.1 (8th Cir. 2005) (en banc)).

Defendants are entitled to summary judgment on this claim because Plaintiff has no fundamental right to be free from searches of his prison cell. *See Hudson v. Palmer*, 468 U.S. 517, 536 (1984) (holding that prisoners have no legitimate expectation of privacy in their prison cells, and thus the Fourth Amendment proscription against unreasonable searches does not apply to prison cells). Moreover, there is no evidence that would allow a reasonable jury to conclude that any Defendant's actions with respect to the cell search were shocking to the contemporary conscience. For these reasons, this Court recommends that Defendants be granted summary judgment on Plaintiff's claims that the search of his cell violated his right to be free from retaliatory discipline and his right to substantive due process.

### F. Transfer to Administrative Control Unit

The parties also seek summary judgment on Plaintiff's claim that Defendants violated his rights by transferring him from one housing unit in the segregation wing at the Oak Park Heights facility to the more restrictive ACU. Plaintiff contends that he is entitled to summary judgment because: (1) the transfer occurred shortly after he filed an informal grievance with Associate

Warden McComb; (2) the timing of the transfer demonstrates Defendants' retaliatory intent;and (3) his lengthy stay in Complex-5 prior to his transfer to the ACU, which was the result of a lengthy history of disciplinary violations, indicates that  Defendants' proffered reason for the transfer is a pretext.  Plaintiff invokes the Fourteenth Amendment's substantive-due-process protections and the prohibition against retaliation for a prisoner's exercise of his First Amendment rights.

### 1.    Substantive due process

As noted above, "[t]o establish a violation of substantive due process rights by an executive official, a plaintiff must show (1) that the official violated one or more fundamental constitutional rights, and (2) that the conduct of the executive official was shocking to the contemporary conscience."  *Flowers*, 478 F.3d at 873 (quotations omitted).  First, Plaintiff does not have a "fundamental constitutional right" so deeply rooted in our Nation's traditions to be housed in a less restrictive setting within a prison.  *See Brown v. Nix*, 33 F.3d 951, 954 (8th Cir. 1994) (concluding that the inmate failed to assert deprivation of a fundamental right by transfer to more restrictive prison setting).  Further, given the undisputed evidence in the record of Plaintiff's lengthy disciplinary history for violations of prison rules while at the Oak Park Heights facility (*see* Lopez Aff. ¶ 4, Attach. 1, Exs. D-F), and the fact that Plaintiff had, at the time of his transfer, amassed such a lengthy disciplinary history that his transfer to the ACU was authorized by prison policies (*see* Stevenson Aff. ¶ 5), Defendants' actions in transferring

Plaintiff to ACU cannot reasonably be characterized as "truly irrational." *See Anderson v. Douglas County*, 4 F.3d 574, 577 (8th Cir. 1993) (noting that a plaintiff asserting a substantive-due-process claim must show that the government's action is truly irrational and that this is a higher bar than merely arbitrary, capricious, or unlawful action). Because no reasonable jury could conclude that Plaintiff's transfer was shocking to the contemporary conscience,, Defendants' motion for summary judgment on this claim should be granted and Plaintiff's motion denied.

### 2. First Amendment Retaliation

Plaintiff asserts that Defendants retaliated against him by disciplining him (i.e., transferring him) for exercising his First Amendment right to file grievances. A prisoner may bring a claim for retaliatory discipline if a prison official files a disciplinary charge in retaliation for the prisoner's exercise of his constitutional rights. *Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989). As noted above, such a claim requires a plaintiff to show that "(1) the prisoner exercised a constitutionally protected right; (2) prison officials disciplined the prisoner; and (3) exercise of the right was the motivation for the discipline." *Meuir*, 487 F.3d at 1119. Such a retaliation claim will fail, however, where the prisoner actually violated a prison rule. *Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir. 1994). To prevail on summary judgment, Defendants need only provide "some evidence" that Plaintiff violated a rule. *See Moore v. Plaster*, 266 F.3d 928, 931 (8th Cir. 2001).

Here, Plaintiff has presented no evidence that his transfer to the ACU was retaliatory or that retaliation was the actual motivation for the transfer. *See Griggs v. Norris*, 297 Fed. App'x 553, 555 (8th Cir. 2008) (upholding district court's decision that a prisoner failed to create a genuine issue as to whether disciplinary charges were retaliatory and whether retaliation for grievances was actual motivating factor for transfer to more restrictive prison setting because he did not dispute that he had a poor institutional file and numerous disciplinary violations). Plaintiff argues that the timing of the transfer in relationship to his grievance demonstrates Defendants' retaliatory motive. Although the grievance and the transfer were "temporally close," Plaintiff fails to present any affirmative evidence of a retaliatory motive. *See Dasta v. Shearin*, No. 04-4475 (MJD/RLE), 2007 WL 4952768, at *23 (D. Minn. Nov. 15, 2007) (concluding that temporal proximity without more was insufficient evidence of retaliatory motive to survive summary judgment on a claim that prison officials engaged in retaliatory discipline by searching an inmate's cell not long after he filed certain grievances).

In addition, Defendants have provided at least "some evidence" that the reason they transferred Plaintiff to the ACU was because of actual rules violations. (*See* Stevenson Aff. ¶ 5.) In fact, Plaintiff's disciplinary violations over the course of his incarceration at Oak Park Heights have led to his accumulation of a segregation sentence so long that he will not be eligible for release back to the general population before his release from DOC custody. (*Id.*) Moreover, just before his transfer to ACU on April 30, 2009, on April 25, 2009, Plaintiff

admitted violating the prison's rules prohibiting possession of contraband in his cell based on his possession of smuggling devices and pornographic drawings. (McComb Aff. ¶ 10, Attach. 1, Ex. I.) Therefore, Plaintiff's argument that Defendants' justification for his transfer is a pretext is unpersuasive. Plaintiff's confinement in segregation prior to his transfer to the ACU did not obligate Defendants to leave him where he was simply because he had filed a grievance. And Plaintiff's guilty plea to a rules violation shortly before his transfer means that he cannot demonstrate that the transfer was retaliatory because his alleged discipline followed an admitted violation of a prison rule. Based on the record before it, even when viewing the evidence in the light most favorable to Plaintiff, this Court concludes that no reasonable jury could find that Defendants transferred Plaintiff from Complex-5 to ACU in retaliation for filing a grievance. Accordingly, Defendants' motion for summary judgment on this claim should be granted, and Plaintiff's motion denied.

### III.    Plaintiff's Motion for Appointment of Councsel

On June 2, 2010, Plaintiff filed a Motion for the Appointment of Counsel (Doc. No. 30). Plaintiff thereby asks this Court to appoint counsel to represent him in this case because he cannot afford to retain counsel himself, is in a maximum-security prison, is housed in administrative segregation for disciplinary violations, has demanded a jury trial, and because the parties and the Court would substantially benefit from the appointment of counsel.

*Pro se* litigants do not have a constitutional or statutory right to counsel in civil cases. *Stevens v. Redwing*, 146 F.3d 538, 546 (8th Cir. 1998). Rather, the appointment of counsel is a matter of the court's discretion. *Mosby v. Mabry*, 697 F.2d 213, 214 (8th Cir. 1982); *see also* 28 U.S.C. § 1915(e)(1) (stating that the court may "request an attorney to represent any person unable to afford counsel"). The standard for appointment of counsel in such cases is whether both petitioner and the court would substantially benefit from the assistance of counsel. *Johnson v. Williams*, 788 F.2d 1319, 1322 (8th Cir. 1986); *see also Plummer v. Grimes*, 87 F.3d 1032, 1033 (8th Cir. 1996) ("A district court is to decide whether the plaintiff and the court will substantially benefit from the appointment of counsel[.]"). Among the factors the court should consider are "the factual complexity of the issues; the ability of an indigent to investigate the facts; the existence of conflicting testimony; the ability of an indigent to present his claim; and the complexity of the legal issues." *Nachtigall v. Class*, 48 F.3d 1076, 1081-82 (8th Cir. 1995).

After reviewing these factors, this Court finds that neither the facts nor the legal issues involved in this care are so complex as to warrant appointment of counsel. Although Plaintiff's lack of legal knowledge may present some disadvantages, in terms of the requisite time and effort that may be attendant to the presentation of his claim, this Court has taken that into account when it allowed Plaintiff the opportunity to amend his Complaint twice. In addition, Plaintiff has articulated his claims and argued his positions quite well, and has

been able to communicate effectively with this Court. Therefore, this Court is satisfied that appointment of counsel would not substantially benefit the Court or Plaintiff. Accordingly, this Court recommends that Plaintiff's request be denied.

In addition this Court recommends that Plaintiff's request be denied because this Court has recommended that Defendants' motion for summary judgment be granted and Plaintiff's motion for summary judgment be denied. Should the District Court disagree with this Court's recommendation and allow some or all of Plaintiff's claims to proceed to trial, Plaintiff and the District Court may substantially benefit from the appointment of counsel at that time. Therefore, this Court recommends that Plaintiff should not be foreclosed from renewing his motion if such circumstances arise.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Defendants' Motion for Summary Judgment (Doc. No. 22), be **GRANTED**;

2.      Plaintiff's Motion for the Appointment of Counsel (Doc. No. 30), be **DENIED**;

3.      Plaintiff's Motion for Summary Judgment (Doc. No. 31), be **DENIED**; and

4.      This action be **DISMISSED WITH PREJUDICE**.

Date: July 27, 2010

          *s/ Jeffrey J. Keyes*
JEFFREY J. KEYES
United States Magistrate Judge

Under D. Minn. Loc. R. 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 10, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within **fourteen days** after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.